**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
November 8, 2011

No. 10-20868

Lyle W. Cayce
Clerk

ACCESS MEDIQUIP L.L.C., a Texas Limited Liability Company,

Plaintiff - Appellant

v.

UNITEDHEALTHCARE INSURANCE COMPANY, A Connecticut
Corporation,

Defendant - Appellee

Appeals from the United States District Court
for the Southern District of Texas

Before REAVLEY, ELROD, and GRAVES, Circuit Judges.

REAVLEY, Circuit Judge:

Access Mediquip L.L.C. ("Access") appeals a summary judgment for defendant UnitedHealthcare Insurance Company ("United").  The issue on appeal is whether Access's state-law claims of promissory estoppel, quantum meruit, unjust enrichment, negligent misrepresentation, and violations of the Texas Insurance Code, §§ 541.051(A) & (B) and 541.061(1) & (2), are preempted by the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA").

Access's lawsuit arises from United's refusal to pay some or all of Access's claims for reimbursement for medical-device procurement and financing services

No. 10-20868

provided in connection with over 2,000 patients insured under ERISA plans administered by United. The district court limited discovery to the claims concerning the 300 patients with respect to whom Access seeks the largest amount of reimbursement. After written discovery was completed for those claims, United filed a motion for summary judgment on preemption grounds against the state-law claims relating to 269 of the 300. The district court ordered United to limit its motion to Access's claims arising from services for three patients, whom the district court anticipates will serve as exemplars for treatment of the preemption issue for the remaining patients. United filed a supplemental memorandum of law identifying patients L.G., L.C., and D.T. The district court held that all of Access's state law claims relating to treatment for these three patients are preempted under ERISA's general preemption clause, 29 U.S.C. § 1144(a). The judgment was made appealable by its entry in accord with Fed. R. Civ. P. 54(b).

With certain exceptions not applicable here, § 1144(a) states that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." We REVERSE with respect to Access's promissory estoppel, negligent misrepresentation, and Texas Insurance Code claims, because these claims are premised on allegations and evidence that Access provided the services in reliance on United's representations that it would pay reasonable charges for Access's services. We AFFIRM with respect to Access's quantum meruit and unjust enrichment claims, because these claims depend on Access's assertion that without its services the patients' ERISA plans would have obliged United to reimburse a different provider for the same services.

2

No. 10-20868

## I. Summary Judgment Standard

We review a summary judgment *de novo*, applying the same standards as the district court. *Trinity Universal Ins. Co. v. Employers Mut. Cas. Co.*[1] Summary judgment should be affirmed "if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *U.S. ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 327 (5th Cir. 2011); *Hubbard v. Blue Cross & Blue Shield Ass'n*, 42 F.3d 942, 945 (5th Cir. 1995). ERISA preemption is an affirmative defense which must be proven by the defendant at trial.[2] "To obtain summary judgment, 'if the movant bears the burden of proof on an issue . . . because . . . as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the . . . defense to warrant judgment in his favor.'" *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). A non-movant generally cannot resist summary judgment by resting on its allegations, but when a movant seeks summary judgment by showing that the allegations in the complaint render the claims preempted, those allegations are construed in the light most favorable to the non-movant. *E.g.*, *Sw. Bell Tel., LP v. City of Houston*, 529 F.3d 257, 260 (5th Cir. 2008) ("As part of our determining whether AT&T stated a claim sufficient to avoid dismissal [on grounds including federal preemption], the facts alleged in its complaint are taken as true, with those allegations being construed in the light

---

[1] 592 F.3d 687, 690 (5th Cir. 2010).

[2] *Bank of La. v. Aetna U.S. Healthcare Inc.,* 468 F.3d 237, 242 (5th Cir. 2006)*; Dueringer v. General Am. Life Ins. Co.*, 842 F.2d 127, 130 (5th Cir. 1988).

No. 10-20868

most favorable to AT&T, the non-movant."). We set forth the facts of the case and our understanding of Access's claims with those principles in mind.

## II. Background

Access procures and finances the purchase of medical devices for health care providers. Usually, a provider requests Access to finance and procure a medical device before the procedure using the device is performed. Access then contacts the patient's insurer to confirm that the insurer will reimburse Access for the device and pay for Access's services. If the insurer will pay, Access procures a suitable device and supplies it to the provider, usually without charge. Rather than sell the devices to the providers, Access looks almost exclusively to insurers for payment. From time to time, Access finances the cost of a device it did not procure, for example if a provider has already used the device in a medical procedure. As with its procurement services, Access will provide financing only after contacting the patient's insurer for confirmation that the insurer will reimburse Access for the device and its services. Access will generally refuse to procure or finance a device if the insurer tells Access that the patient is not covered, that the device or procedure is not covered, that pre-certification of the device is required and has been denied, or that Access may not directly bill the insurer for the device.

A. Patient L.G.

On September 18, 2007, Century City Doctors Hospital ("Century City") asked Access to procure a prosthesis for use in patient L.G.'s back surgery, to be performed on September 20, 2007. On September 18, an Access representative, Violet Harrell, contacted United to confirm coverage for the prosthesis. In an August 17, 2010 declaration, submitted to the district court with Access's

response to United's motion for summary judgment, Harrell avers that she spoke with United representative Steve Kirtonia, who "stated that (1) [United] insured L.G.; (2) [Access]'s billing code for the Prosthesis [sic], L8699, was valid; and (3) Access could bill [United] for the Prosthesis [sic]." Harrell's call was transferred to a United representative in United's care coordination department, who "stated that the procedure had been authorized." United's coordination department also gave Harrell "an authorization number for [Access] to use in submitting its claim." Access alleges that United's statements to Harrell amount to representations that United would pay Access reasonable and customary charges for procuring and financing the prosthesis.

L.G. had surgery on September 20, 2007. On September 25, Access submitted a claim to United for the prosthesis under authorization number L8699. On October 31, Century City submitted a claim for its surgical services under authorization number L8699. Century City's claim did not include the cost of the prosthesis. United paid Century City for the surgery, but requested additional information from Access. United subsequently refused to pay for L.G.'s prosthesis.

B. Patient L.C.

On November 19, 2007, Century City asked Access to procure spine fusion instrumentation for use in patient L.C.'s upcoming surgery. That same day, Harrell contacted United to confirm that United would pay for the instrumentation and that Access could bill United directly. Harrell spoke with United representative Kate P., who "advised [Harrell] . . . that L.C. was one of [United]'s insureds, L.C. had out-of-network coverage available, and Access could

No. 10-20868

bill United separately for the Implant [sic]." Kate P. also "informed [Harrell] that 'care notification is not required' for the implant."

L.C. had the surgery on December 6, 2007, and Access submitted a $66,197.00 claim for the instrumentation on May 7, 2008. United initially paid Access $2,500.00 on July 9, 2008, but United subsequently recouped that payment and notified Access by letter that its provision of the instrumentation was "not covered under the patient's health benefit plan." United also generated a "Provider Explanation of Benefits" document, on which appears United's "XU" remark code. The XU code stands for "This service is not reimbursable for this provider at this place of service." United's "Medical Claim Review" unit had reviewed Access's claim for L.C.'s spine instrumentation and determined that it should have been denied under an internal policy concerning surgically implanted devices billed by providers who are not surgical facilities. As early as July 25, 2007, before Access contacted United regarding any of the three patients' care, United had distributed a notice to its staff explaining that claims for such devices submitted "by a Non-facility such as a Surgeon, Supply or [Durable Medical Equipment] Vendor" were to be denied using the XU code.

C. Patient D.T.

On August 25, 2008, a physician at University General Hospital performed back surgery on patient D.T. The surgery included implantation of a four-part spinal cord stimulator. On August 27, University General Hospital asked Access to finance payment for the stimulator. Before Access agreed to do so, Access representative Annette Gordon contacted United to confirm coverage for the stimulator. Access's response to United's motion for summary judgment includes an August 18, 2010 declaration by Gordon. Gordon avers that she

No. 10-20868

contacted United on August 29, 2008, and spoke to "Nathan," a United representative. He "confirmed that D.T. was one of [United]'s insureds and had coverage for the procedure." He indicated that D.T. had "out of network benefits," and he directed Gordon to contact United's care coordination center, which Gordon did on the same day. United representatives at the care coordination center provided Gordon "with a reference number to use in submitting [Access]'s claim for the Stimulator [sic], and an address at which to submit the claim." In reliance on these representations, Access agreed to finance payment for the stimulator.

Access submitted a claim for the stimulator on September 8, 2008, the same day that University General submitted its claim for the surgery. United paid University General's claim on September 19, 2008, but did not pay Access. A week later, United denied payment to Access, stating that United needed various medical records. Later, United paid $19,436.80, the total charges for three of the stimulator's parts, but United has refused to pay for the stimulator's $61,932.00 generator. In February, 2009, United generated a "Provider Explanation of Benefits" document indicating that payment for the generator was denied under the XU remark code.

The district court granted summary judgment for United on the state law claims relating to services for L.G., L.C., and D.T. Preemption under 29 U.S.C. § 1144(a) was the only ground on which the district court granted summary judgment on the state law claims.

### III. Access's Allegations

Access's state law promissory estoppel, negligent misrepresentation, and Texas Insurance Code claims are premised on its allegations that it provided its

No. 10-20868

services for L.G., L.C., and D.T. in reliance on United's representations regarding how much, and under what conditions, United would pay Access for those services.  Regarding its promissory estoppel claim, Access alleges that United representatives' statements regarding L.G., L.C., and D.T. constituted "promises to [Access] to accept bills from [Access] and/or to pay for medical devices and related services that [Access] provided to [United]'s Insureds." Regarding its negligent misrepresentation claim, Access alleges that United's statements constituted representations that the patients "had health benefits coverage that was provided or administered by [United] for the medical devices and related services at issue; and [United] would pay customary and reasonable charges to [Access] for medically necessary devices and services provided for the benefit of [United]'s Insureds."  Regarding its Texas Insurance Code claims, Access alleges that United's statements constitute representations that if Access would finance the patient's device, "[United] would permit [Access] to bill [United] directly, and [United] would pay [Access] customary and reasonable charges for its services."

Access's complaint thus makes clear that the grievance underlying its state law misrepresentation claims is the inconsistency between United's representations and its conduct after Access submitted claims for reimbursement for its services: "In direct breach of their obligations and representations to [Access], [United] ha[s] failed and refused to pay and/or reimburse [Access] on the Claims."

The scenario depicted in Access's complaint is a familiar one in the health care context, as we explained in *Memorial Hospital System v. Northbrook Life Ins. Co.*:

8

No. 10-20868

The scenario depicted in Memorial's appeal is one that is reenacted each day across the country. A patient in need of medical care requests admission to a hospital (or seeks treatment from a doctor). The costs of medical care are high and many providers have only limited budget allocations for indigent care and for losses from patient nonpayment. Naturally, the provider wants to know if payment reasonably can be expected. . . . [I]t is a customary practice to communicate with the plan agents to verify eligibility and coverage. If the provider confirms that a patient has health care insurance that covers a substantial part of the expected costs of the health care, it will normally agree to admit the patient without further ado. Memorial contends that when an insurance company or its agent, including one acting as an ERISA plan fiduciary, verifies coverage to a third-party provider, the insurer should recognize the commercial implications to the provider of its assurances.

904 F.2d 236, 246.

It bears emphasis that, fairly construed, Access's claims allege that United's agents' statements, though superficially about coverage under the plan, were in their practical context assurances that Access could expect to be paid reasonable charges if it would procure or finance the devices used in L.G.'s, L.C.'s, and D.T.'s surgeries. Texas law permits a party alleging an actionable misrepresentation to attempt to prove that it was reasonably misled by a true but crucially incomplete statement that conveyed a false impression of the speaker's intentions. *McCarthy v. Wani Venture, A.S.*, 251 S.W.3d 573, 585 (Tex.App.–Houston [1 dist.] 2007, no pet.) ("a general duty to disclose information may arise in an arm's-length business transaction when a party makes a partial disclosure that, although true, conveys a false impression.") Access alleges that, given the coverage statements' commercial context, it was misleading for United's agents to omit mentioning that, though Access's services were covered under the plan, Access would never actually be reimbursed when

9

No. 10-20868

the time came, because United's policy underlying the "XU" code required denying all claims for surgically implanted devices billed by providers who are not surgical facilities.

## IV.  ERISA Preemption

As noted above, § 1144(a) states that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ."  The Supreme Court has "observed repeatedly that this broadly worded provision is 'clearly expansive.'"  *Egelhoff v. Egelhoff ex rel. Breiner*[3] (quoting *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*[4]).  Simultaneously, however, the Supreme Court recognizes that, given its broadest reading, the phrase "relate to" would encompass virtually all state law.  *Id.* at 146, 121 S. Ct. at 1327; *Travelers*, 514 U.S. at 656, 115 S. Ct. at 1677.  The Supreme Court has also acknowledged that its "connection with" and "reference to" glosses  are "scarcely more restrictive" than the text of § 1144(a), and of little help drawing the line in close cases.  *Egelhoff*, 532 U.S. at 147, 121 S. Ct. at 1327; *Travelers*, 514 U.S. at 656, 115 S. Ct. 1677.  The Court has, therefore, declined to apply an "uncritical literalism" to the phrase, and observed that "[w]e simply must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive."  *Travelers*, 514 U.S. at 656, 115 S. Ct. 1677.

We extensively addressed the interaction between ERISA's objectives and state law claims premised on misrepresentations made to providers considering

---

[3] 532 U.S. 141, 146, 121 S. Ct. 1322, 1327 (2001).

[4] 514 U.S. 645, 655, 115 S. Ct. 1671, 1677 (1995).

whether to provide services to a patient in *Memorial*. In that case, Noffs, Inc., provided health insurance to its employees through an insurance policy purchased from and administered by Northbrook Life Insurance Company. Gloria Echols's husband had recently started working at Noffs when she sought treatment from Memorial Hospital System. Before providing care, Memorial contacted Noffs, who verified that coverage was in effect. In fact, coverage for Echols would not take effect until thirty-five days after Memorial began treating Echols, and the policy did not cover any treatment for illnesses that arose before the coverage took effect. *Memorial*, 904 F.2d at 238.

Asserting that Noffs acted as Northbrook's agent when verifying coverage, Memorial brought various claims against Northbrook, including state law causes of action under the Texas Insurance Code, for equitable estoppel, and for negligent misrepresentation. *Id.* at 239. Memorial appealed the district court's ruling that ERISA preempted the Texas Insurance Code claim, and we reversed. *Id.* at 250. In our opinion we articulated the test we have subsequently used to determine whether § 1144(a) preempts a state law claim. *E.g.*, *Mayeaux v. La. Health Serv. and Indem. Co.*[5] A defendant pleading preemption under 29 U.S.C. § 1144(a) must prove that: "(1) the state law claims address an area of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and (2) the claims directly affect the relationships among traditional ERISA entities–the employer, the plan and its fiduciaries, and the participants and beneficiaries." *Memorial*, 904 F.2d at 245.

The district court summarized our case law as requiring that "to the extent . . . that [the] state law cause of action is based on misrepresentations regarding

---

[5] 376 F.3d. 420, 432 (5th Cir. 2004).

No. 10-20868

the extent of coverage under an ERISA plan or the manner of processing and disposing of the claim for payment by the ERISA plan, the cause of action is preempted." This is inconsistent with *Transitional Hospitals Corp. v. Blue Cross*, 164 F.3d 952, 955 (5th Cir. 1999), in which we explicitly rejected the proposition that ERISA preempts state law causes of action based on misrepresentations regarding the extent of an insured's coverage. The allegations at issue in *Transitional* were quite similar to those in this case. Transitional Hospital Corporation (THC) had provided hospital care for patient Isaac Davis. Transitional provided the care in reliance on defendant insurers' representations that Davis's employer's "ERISA plan would reimburse THC for 100% of Davis's hospital bills after exhaustion of his Medicare benefits." *Id.* at 953. When THC submitted claims for Davis's care, the defendant insurers determined that the plan would cover less than one percent of the care THC had provided to Davis because it was a nonparticipating hospital. THC's claims in the resulting lawsuit included causes of action for negligent misrepresentation and claims under the Texas Insurance Code. We held that these claims were not preempted, because they were not premised on Davis's right to recover benefits under the plan's terms, but rather on the defendants' misleading representations regarding the extent that the plan would reimburse THC for it services:

> THC's state-law claims alleging common law misrepresentation and statutory misrepresentation under the Texas Insurance Code Art. 21.21 are not dependent on or derived from Davis's right to recover benefits under the [patient's employer's] plan. Rather, THC alleged that, 'to the extent that Davis is not covered by the Policy as represented by Blue Cross to THC,' Defendants made misrepresentations actionable under common law and the Texas Insurance Code.

*Id.* at 955 (footnote omitted).

No. 10-20868

United asserts that we have "consistently used" the "'existence' of patient coverage versus 'extent' of patient coverage analysis" under which claims based on "extent" misrepresentations are preempted.  But neither United nor the district court cite, and we are not aware of, any case in which we held that ERISA preempts a third-party provider's state law misrepresentation claims premised on allegations that it was misled by an ERISA plan's statements regarding the extent of coverage for the provider's services.  On the contrary, the claim we held was not preempted in *Transitional* was premised on an alleged misrepresentation regarding the extent of Davis's coverage, and our opinion made plain that our case law requires that result when there is some coverage, unless the claim in question is dependent on, and derived from the rights of the plan beneficiaries to recover benefits under the terms of the plan.

### V. Analysis

The dispositive issue in this appeal is therefore whether Access's state law claims are dependent on, and derived from the rights of L.G., L.C., and D.T. to recover benefits under the terms of their ERISA plans.

A. Access's State Law Misrepresentation Claims

*Transitional* requires that we reverse the district court's judgment with respect to Access's state law misrepresentation claims. Addressing *Transitional* in its summary judgment order, the district court stated that "[i]n *Transitional*, the plaintiff alleged that the insurer misrepresented that it would pay 100% of all bills after Medicare benefits were deducted." The district court then reasoned that "[i]n this case, unlike the situation in *Transitional*, there is no allegation that United representatives told Access that it would pay 100% of all bills submitted for payment regardless of the terms of the applicable ERISA plan."

No. 10-20868

This characterization of Access's allegations elides the essential substance of Access's grievance: that the practical implication of United's statements about coverage was that Access would be paid reasonable charges for the services it would provide in connection with the patients' surgeries. In *Memorial* we observed that if preemption denies them recourse to state law for expenses incurred due to plan fiduciaries' misleading statements about coverage, "providers will be understandably reluctant to accept the risk of non-payment, and may require up-front payment by beneficiaries–or impose other inconveniences–before treatment will be offered." 904 F.2d at 247. That scenario, we observed, "does not serve, but rather directly defeats, the purpose of Congress in enacting ERISA." *Id.* at 247-48. It is difficult to see why preemption should depend on whether a provider alleges that it was misled by explicit promises of future payment or by statements about coverage that conveyed a false impression of future payment. In any event, the facts of this case and *Transitional* do not actually differ in that regard. The misrepresentations alleged in *Transitional* also took the form of statements about the extent of coverage available under the ERISA plan. Our opinion relates that "THC alleges that the defendants misrepresented that [Davis's employer]'s *ERISA plan* would reimburse THC for 100% of Davis's hospital bills after exhaustion of his Medicare benefits." *Transitional*, 164 F.3d at 953 (emphasis added); *see also id.* at 954 (characterizing the "dispositive issue" as "whether ERISA preempts THC's state-law claims relating to the defendants' alleged negligent *misrepresentations regarding Davis's coverage under [his employer]'s ERISA plan.*") (emphasis added). The district court order in *Transitional* explained that "THC maintains that the defendants misrepresented

14

*the extent of coverage* before Davis was admitted as a transfer patient to the hospital and again several months later when his Medicare benefits were exhausted."[6]

The "existence-of-coverage" versus "extent-of-coverage" distinction applied by the district court is thus at odds with both the reasoning and the result of *Transitional.*    Other circuits that have adopted the approach we set forth in *Memorial* and *Transitional* have also rejected an existence-versus-extent approach.[7]

The merits of Access's misrepresentation claims do not depend on whether its services were or were not fully covered under the patients' plans. If the plans provide less coverage than United's agents indicated, Access must still prove that it was reasonable to rely on their statements as representations of how much and under what terms Access could expect to be paid. If the plans do provide the same level of coverage United indicated, Access may nevertheless seek to prove its misrepresentation claims by showing that United's statements

---

[6] Order of January 12, 1998, A-97-CA-045-SS, Doc. No. 44 at 2 (S.D. Tex., Jan. 12, 1998), Appellate Record at 592, *Transitional Hospitals Corp. v. Blue Cross & Blue Shield of Tex.*, 164 F.3d 952 (5th Cir. 1999) (No. 98-50158) (emphasis added).

[7] *E.g.*, *Lordmann Ent., Inc. v. Equicor, Inc.*, 32 F.3d 1529, 1530-34 (11th Cir. 1994) (state law claims premised on inconsistency between representation that plan covered 80% of insured's home nursing care and insurer's subsequent willingness to pay only 14% of the care's cost) (cited in *Transitional*, 164 F.3d at 955); *In Home Health, Inc. v. Prudential Ins. Co. of Am.*, 101 F.3d 600, 604-07 (8th Cir. 1996); *Hospice of Metro Denver, Inc. v. Group Health Ins. of Ok., Inc.*, 944 F.2d 752, 753, 755-56 (10th Cir. 1991) (representation that "coverage was available" for hospice care of ERISA plan beneficiary belied by later plan's subsequent denial coverage on the basis of policy's preexisting condition clause); *see also The Meadows v. Emp'rs Health Ins.*, 47 F.3d 1006, 1008-11 (9th Cir. 1995) (adopting *Memorial* approach); *Catholic Healthcare*, 321 F. App'x 563, 564-65 (9th Cir. 2008) (applying *Meadows* and holding that provider's claims based on representations of the extent of insured's coverage are not preempted).

No. 10-20868

regarding coverage, while accurate, were nevertheless misleading because United's agents omitted to mention that, covered or not, Access's services would not be reimbursed. *See Santanna Natural Gas Corp. v. Hamon Operating Co.* (a speaker who makes a partial disclosure assumes duty to tell whole truth, even when the speaker was under no duty to make the partial disclosure)[8]; *Int'l Sec. Life Ins. Co. v. Finck* (same)[9]. Consultation of the plans' terms is thus not necessary to evaluate whether United's agents' statements were misleading. The finder of fact need only determine (1) the amount and terms of reimbursement that Access could reasonably have expected given what could fairly be inferred from the statements, and (2) whether United's subsequent disposition of the reimbursement claims was consistent with that expectation.

The state law underlying Access's misrepresentation claims does not purport to regulate what benefits United provides to the beneficiaries of its ERISA plans, but rather what representations it makes to third parties about the extent to which it will pay for their services. To prevail on these claims, Access need not show that United breached the duties and standard of conduct for an ERISA plan administrator, because Access's alleged right to reimbursement does not depend on the terms of the ERISA plans. It is immaterial whether the alleged statements regarding the extent that the patients' plans covered Access's services were correct or incorrect as descriptions of the plans' terms. As assurances of how much Access would be paid, the statements are belied by United's subsequent refusal to reimburse some or all

---

[8] 954 S.W. 2d 885, 891 (Tex. App.–Austin, 1997, pet. den.).

[9] 475 S.W.2d 363, 370 (Tex.Civ.App.—Amarillo 1972), *rev'd in part on other grounds*, 496 S.W.2d 544 (Tex. 1973).

No. 10-20868

of Access's claims. United points out that it is a plan fiduciary and its decisions regarding what claims to pay constitute administration of an ERISA plan that is governed by that statute. The critical distinction, however, is not whether the parties to a claim are traditional ERISA entities, but whether the claims affect an aspect of a *relationship* that is comprehensively regulated by ERISA. *Bank of La. v. Aetna U.S. Healthcare Inc.*[10] We thus rejected essentially the same argument in *Memorial*, because the "obligations of ERISA fiduciaries run only toward the plan, for the benefit of participants and beneficiaries." 904 F.2d at 247. Moreover, a one-time recovery for Access on its state-law misrepresentation claims will not affect the on-going administration or obligations of the ERISA plans that United administers, because the recovery "in no way expands the rights of the patient to receive benefits under the terms of the health care plan." *Id.* at 246. State law claims of the kind asserted in *Memorial*, *Transitional*, and this case concern the relationship between the plan and third-party, non-ERISA entities who contact the plan administrator to inquire whether they can expect payment for services they are considering providing to an insured. The administrator's handling of those inquiries is not a domain of behavior that Congress intended to regulate with the passage of ERISA, which "imposes no fiduciary responsibilities in favor of third-party health care providers regarding the accurate disclosure of information, or, indeed, regarding any other matter." *Memorial*, 904 F.2d at 247.

It is difficult to see how consultation of the plan's terms would be necessary to determine the amount of Access's recovery, given that the compensatory recovery Access seeks can be measured by the cost of the services

---

[10] 468 F.3d 237, 243 (5th Cir. 2006).

it alleges United induced it to provide. If consultation of the plans is necessary, United concedes that this, without more, does not require preemption. *Id.* (explaining that the need to consult an ERISA plan in order to determine damages shows only an "incidental relation . . . insufficient on these facts to require a finding of preemption.")

In *E.I. Dupont De Nemours & Co. v. Sawyer*,[11] employees sued their former employer, also the administrator of their former ERISA plan, for misleading them into agreeing to transfer to a subsidiary. *Id.* at 790-91. The employer subsequently sold the subsidiary to another entity who imposed terms of employment, including a reduction in ERISA protected benefits. *Id.* at 791. Holding that the employees' claims were not preempted, we acknowledged that litigating the claims could require inquiry into the terms of the ERISA plans in order to calculate the extent of damages. *Id.* at 800. We observed, however, that the employees' allegation that the sale caused losses with regard to their ERISA protected benefits did not require finding preemption. On the contrary, "[w]e have rejected the argument that 'any lawsuit in which reference to a benefit plan is necessary to compute plaintiff's damages is preempted by ERISA . . . .'" *Id.* at 800 n.11 (quoting *Rozzell v. Security Servs., Inc.*, 38 F.3d 819, 822 (5th Cir. 1994)).

B. Access's Unjust Enrichment and Quantum Meruit Claims

Matters stand differently with Access's unjust enrichment and quantum meruit claims. Access alleges that, without its services, another provider would have had to procure or finance the devices. Access's unjust enrichment and quantum meruit claims depend on its allegations that the ERISA plan would

---

[11] 517 F.3d 785 (5th Cir. 2008).

No. 10-20868

have obliged United to reimburse that other provider.  Access can therefore recover under these claims only to the extent that the patients' ERISA plans confer on their participants and beneficiaries a right to coverage for the services provided.  Such claims are preempted under the test articulated in *Transitional.*

The considerations underlying the *Memorial* test also favor preemption of Access's unjust enrichment and quantum meruit claims.  ERISA preemption protects plans from unexpected financial consequences that could result from routine exposure to state-law claims.  State-law claims premised on misrepresentations to a third party provider do not greatly implicate this concern, because an ERISA plan can avoid liability under such claims by taking care that it does not mislead providers regarding what they can expect to be paid if they render services for the plan's insureds.  But there is no equivalent way for plan administrators to limit their exposure to state-law unjust enrichment or quantum meruit claims.  Those claims, if not preempted, would allow any provider who has provided care for which the ERISA plan denied coverage to challenge the ERISA plan's interpretation of its policies in state court.  That outcome would run afoul of Congress's intent that the causes of action created by ERISA be the exclusive means of enforcing an ERISA plan's terms, and permit state law to interfere with the relations among ERISA entities.  *See Mayeaux,* 376 F.3d at 433 ("If a medical practitioner could collaterally challenge a plan's decision not to provide benefits, he would directly affect the relationship between the plan and its beneficiary, two traditional ERISA entities.")

## VI. Conclusion

For the foregoing reasons, we affirm the district court's judgment with respect to Access's quantum meruit and unjust enrichment claims; we reverse

No. 10-20868

the judgment with respect to Access's claims for negligent misrepresentation, promissory estoppel, and violations of the Texas Insurance Code, and we remand the case for proceedings not inconsistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.